No. 14-3084

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

DIGITAL RECOGNITION NETWORK, INC.;
VIGILANT SOLUTIONS, INC.,

*Plaintiffs-Appellants,*

v.

MIKE BEEBE, *in his official capacity as Governor
of the State of Arkansas*; DUSTIN McDANIEL, *in
his official capacity as Attorney General of the
State of Arkansas*,

*Defendants-Appellees.*

On Appeal from the United States District Court
For the Eastern District of Arkansas
Case No. 4:14-cv-00327-BSM

## BRIEF FOR APPELLANTS

Jane W. Duke
MITCHELL, WILLIAMS, SELIG,
    GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone: (501) 688-8842
Facsimile: (501) 918-7842
jduke@mwlaw.com

Michael A. Carvin
Ryan J. Watson
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
macarvin@jonesday.com
rwatson@jonesday.com

*Counsel for Plaintiffs-Appellants*

## SUMMARY OF THE CASE

This case presents a First Amendment challenge to the Arkansas Automatic License Plate Reader System Act ("the Act"), which prohibits Plaintiffs-Appellants ("Appellants") from disseminating license-plate data that is collected by automatic license plate reader ("ALPR") systems or from using ALPR systems to collect license-plate data. Because the Act violates longstanding First Amendment principles, Plaintiffs are seeking declaratory and injunctive relief against the Arkansas Governor (Mike Beebe) and Attorney General (Dustin McDaniel) in their official capacities (collectively, "Appellees").

The District Court erroneously held that Appellees are immune from this suit because the Act does not impose a criminal penalty, but instead deputizes citizens of Arkansas to financially penalize Appellants' speech by bringing civil damages actions. The First Amendment does not, however, tolerate the imposition of a Hobson's Choice on speakers by foreclosing judicial review until after they have been exposed to liability under a speech-suppressing law. Moreover, because Appellees have a host of connections with the Act, this case falls squarely within the *Ex Parte Young* exception to sovereign immunity. *See* 209 U.S. 123 (1908).

Oral argument of twenty minutes per side should be held because there are substantial grounds for challenging the District Court's ruling, and the exploration of these grounds at oral argument would assist the Court in rendering its decision.

i

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant Digital Recognition Network, Inc. ("DRN") states that no publicly held corporation owns ten percent or more of its stock and that although DRN does not have a parent corporation, Plaintiff-Appellant Vigilant Solutions, Inc. ("Vigilant") does own a majority interest in DRN.

Pursuant to Federal Rule of Appellate Procedure 26.1, Vigilant states that it has no parent corporation and that no publicly held corporation owns ten percent or more of its stock.

Dated: October 21, 2014

Respectfully submitted,

s/ Michael A. Carvin
Michael A. Carvin
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
macarvin@jonesday.com

*Counsel for Plaintiffs-Appellants*

Appellate Case: 14-3084    Page: 3    Date Filed: 10/21/2014 Entry ID: 4208319

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE ................................................................................... i

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

TABLE OF AUTHORITIES ................................................................................ v

JURISDICTIONAL STATEMENT ..................................................................... 1

STATEMENT OF THE ISSUE ........................................................................... 1

STATEMENT OF THE CASE ............................................................................. 2

    A.     Factual Background ................................................................................ 2

    B.     The Arkansas Automatic License Plate Reader System Act ............... 4

    C.     Procedural History and Summary of the District Court's
            Decision ................................................................................................. 6

SUMMARY OF ARGUMENT ............................................................................ 9

ARGUMENT ...................................................................................................... 16

I.    THE FIRST AMENDMENT DOES NOT TOLERATE THE
      IMPOSITION OF A HOBSON'S CHOICE ON SPEAKERS BY
      CLOSING THE COURTHOUSE DOORS TO THEM UNTIL
      AFTER THEY HAVE BEEN EXPOSED TO LIABILITY UNDER A
      SPEECH-SUPPRESSING LAW .................................................................. 17

II.   THE *EX PARTE YOUNG* DOCTRINE IS DESIGNED TO
      IDENTIFY THE APPROPRIATE STATE DEFENDANT, NOT TO
      PRECLUDE LIVE CONTROVERSIES WITH THE STATE FROM
      BEING TIMELY ADJUDICATED ............................................................. 22

III.   THE ATTORNEY GENERAL AND GOVERNOR HAVE
      SUFFICIENT CONNECTIONS WITH THE ACT FOR THE
      PURPOSES OF *EX PARTE YOUNG* ....................................................... 25

    A.     Binding Precedent Dictates That the Governor and Attorney
            General Have "Some Connection" with the Act Due to Their
            Authority to Execute and Enforce State Law, Including the
            Attorney General's Authority to Advise the Legislature and
            State Agencies ....................................................................................... 25

Appellate Case: 14-3084     Page: 4     Date Filed: 10/21/2014 Entry ID: 4208319

B. Even if a More Specific Connection with the Act Is Required, the Attorney General Clearly Has Such a Connection Because He Will Certainly Be a Litigant in a Case Addressing the Constitutionality of the Act ...............................................................33

1. The Attorney General is connected to the Act because he has a right to intervene and participate in any suit where the Act's constitutionality is challenged, including in a private damages action filed against Appellants under the Act ...............................................................33

2. The Attorney General has an adequate connection with the Act because he has the power to bring a direct action to enforce the Act ...............................................................40

3. The Attorney General has a sufficient connection with the Act because there is a significant possibility that he will be involved in defending lawsuits brought against him or other state actors pursuant to the Act ...........................46

C. The Governor Is Sufficiently Connected to the Act Because He Could Order the Attorney General Not to Defend the Act's Constitutionality and Not to Initiate a Suit Against Plaintiffs Based on the Speech at Issue Here ...................................................48

CONCLUSION ...............................................................50

CERTIFICATE OF COMPLIANCE ...............................................................51

ADDENDUM OF STATUTES AND REGULATIONS ...................................A1

CERTIFICATE OF SERVICE ...............................................................A25

Appellate Case: 14-3084     Page: 5     Date Filed: 10/21/2014 Entry ID: 4208319

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*281 Care Committee v. Arneson,*
    638 F.3d 621 (8th Cir. 2011) ........................................................*passim*

*281 Care Committee v. Arneson,*
    766 F.3d 774 (8th Cir. 2014) ........................................................*passim*

*Ark. Dep't of Human Servs. v. Heath,*
    817 S.W.2d 885 (Ark. 1991) ...............................................................34

*Babbitt v. Farm Workers,*
    442 U.S. 289 (1979)...................................................................17, 18

*Brown v. Mortgage Elec. Registration Sys., Inc.,*
    738 F.3d 926 (8th Cir. 2013) ...........................................................41, 42

*Citizens for Equal Protection v. Bruning,*
    455 F.3d 859 (8th Cir. 2006) ........................................................*passim*

*Curtis Lumber Co. v. La. Pac. Corp.,*
    618 F.3d 762 (8th Cir. 2010) ..............................................................41

*Ex parte Young,*
    209 U.S. 123 (1908)...................................................................*passim*

*Fulkerson v. Refunding Bd. of Ark.,*
    147 S.W.2d 980 (Ark. 1941) ..............................................................29

*Hawkins v. Governor,*
    1 Ark. 570 (1839)........................................................................29

*Kitchen v. Herbert,*
    755 F.3d 1193 (10th Cir. 2014) .......................................................27, 32

*Lake View Sch. Dist. No. 25 v. Huckabee,*
    340 Ark. 481 (2000).................................................................30, 49

v

**Page(s)**

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007)..................................................................19

*Mercury Mktg. Techs. of Delaware, Inc. v. State ex rel. Beebe*,
189 S.W.3d 414 (Ark. 2004) .................................................42, 44

*Missouri Protection & Advocacy Services, Inc. v. Carnahan*,
499 F.3d 803 (8th Cir. 2007) .............................................*passim*

*Mobil Oil Corp. v. Attorney General of Virginia*,
940 F.2d 73 (4th Cir. 1991) ...............................17, 18, 33, 40

*Morley v. Berg*,
226 S.W.2d 559 (Ark. 1950) ...............................................44

*N.H. Right to Life PAC v. Gardner*,
99 F.3d 8 (1st Cir. 1996)......................................17, 18, 27

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)..................................................................19

*Papasan v. Allain*,
478 U.S. 265 (1986)...........................................................24, 26

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984)......................................................11, 23, 24

*Reproductive Health Services v. Nixon*,
428 F.3d 1139 (8th Cir. 2005) .........................................*passim*

*Rockefeller v. Hogue*,
429 S.W.2d 85 (Ark. 1968) ...............................................30

*S.C. Wildlife Fed'n v. Limehouse*,
549 F.3d 324 (4th Cir. 2008) ...........................................23, 24, 27

Appellate Case: 14-3084     Page: 7     Date Filed: 10/21/2014 Entry ID: 4208319

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*S. Coll. of Naturopathy v. State ex rel. Beebe,*
    203 S.W.3d 111 (Ark. 2005) ................................................................44

*Smyth v. Ames,*
    169 U.S. 466 (1898)...........................................................................26

*St. Paul Area Chamber of Commerce v. Gaertner,*
    439 F.3d 481 (8th Cir. 2006) .......................................................17, 18

*State Bd. of Workforce Educ. & Career Opportunities v. King,*
    985 S.W.2d 731 (Ark. 1999) ..............................................................30

*State ex rel. Williams v. Karston,*
    187 S.W.2d 327 (Ark. 1945) ...................................................43, 44, 45

*State of Fla. ex rel. Shevin v. Exxon Corp.,*
    526 F.2d 266 (5th Cir. 1976) .............................................................43

*State v. D.S.,*
    378 S.W.3d 87 (Ark. 2011) ................................................................29

*State v. McDiarmid,*
    27 Ark. 176 (1871)...........................................................................29

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014).................................................................*passim*

*United States v. Metro. St. Louis Sewer Dist.,*
    569 F.3d 829 (8th Cir. 2009) .............................................................17

*Weiss v. Maples,*
    253 S.W.3d 907 (Ark. 2007) ..............................................................29

*Zanders v. Swanson,*
    573 F.3d 591 (8th Cir. 2009) .............................................................16

Appellate Case: 14-3084    Page: 8    Date Filed: 10/21/2014 Entry ID: 4208319

# TABLE OF AUTHORITIES
## (continued)

Page(s)

**STATUTES**

28 U.S.C. § 1291 ..................................................................................1

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1343(a) .............................................................................1

28 U.S.C. § 2403(b) ......................................................................34, 40

42 U.S.C. § 1983 ..................................................................................1

Ark. Code Ann. § 4-88-104 ................................................................42

Ark. Code Ann. § 16-111-106(b) ........................................................34

Ark. Code Ann. § 25-16-702(a), (b) ........................................31, 32, 47

Ark. Code Ann. § 25-16-703 ...................................................34, 43, 47

Ark. Code Ann. § 25-16-704(a) ..........................................................47

Ark. Code Ann. § 25-16-705(a) ..........................................................47

Ark. Code Ann. § 25-16-706(a), (e) ........................................31, 32, 43

Ark. Code Ann. § 25-16-713(a) .....................................................30, 48

Automatic License Plate Reader System Act, 2013 Ark. Acts 1491
(codified at Ark. Code Ann. § 12-12-1801 *et seq.*) ....................................*passim*

Mo. Rev. Stat. § 27.030 ...........................................................13, 37, 38

Mo. Rev. Stat. § 56.060(1) ..................................................................38

Mo. Rev. Stat. § 115.631(2) .................................................................38

Neb. Rev. Stat. § 42-104 .....................................................................25

Appellate Case: 14-3084     Page: 9     Date Filed: 10/21/2014 Entry ID: 4208319

**Page(s)**

Neb. Rev. Stat. § 42-106 ........................................................................25

Neb. Rev. Stat. § 84-731 ..................................................................28, 29

**OTHER AUTHORITIES**

Ark. Att'y Gen. Op. No. 81-70, 1981 Ark. A.G. LEXIS 167 (Mar. 27,
1981) ...............................................................................................30

Ark. Att'y Gen. Op. No. 2003-165 (Aug. 28, 2003) ...............................31

Ark. Att'y Gen. Op. No. 2009-040, 2009 Ark. A.G. LEXIS 165 (Apr.
17, 2009) .........................................................................................30

Ark. Const. Article VI, § 1 ............................................................29, 30, 49

Ark. Const. Article VI, § 2 ............................................................28, 29, 48

Ark. Const. Article VI, § 7 ......................................................................28

Ark. Const. Article XV, § 3 ................................................................30, 49

Arkansas Attorney General: Our Office – Departments, *available at*
http://arkansasag.gov/our-office/departments/ (last visited Oct. 17,
2014) ...............................................................................................30

Arkansas Secretary of State: Candidate Information, *available at*
https://www.ark.org/arelections/index.php (last visited Oct. 13,
2014) ...............................................................................................43

Attorney General: Representing State Agencies, *available at*
http://arkansasag.gov/programs/arkansas-lawyer/representing-
state-agencies/ (last visited July 7, 2014) .......................................32

Borgmann, Caitlin, *Legislative Arrogance and Constitutional
Accountability*, 79 S. Cal. L. Rev. 753 (2006)..................................25

ix

**Page(s)**

*City & Town: The Official Publication of the Arkansas Municipal League*, vol. 69, No. 05 (May 2013), *available at* http://www.arml.org/documents/05_2013_CityNTown_WEB_000.pdf ................................................................................................4

Federal Rule of Civil Procedure 5.1 ................................................34, 35

Manion, Maya, *Privatizing Bans on Abortion: Eviscerating Constitutional Rights Through Tort Remedies*, 80 Temp. L. Rev. 123 (2007).............................................................................25

Neb. Const. Article IV, § 6 ........................................................28

Appellate Case: 14-3084     Page: 11     Date Filed: 10/21/2014 Entry ID: 4208319

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because this is a federal-question action that arises under the First Amendment to the U.S. Constitution and 42 U.S.C. § 1983. On August 22, 2014, the District Court entered an order that dismissed the case and denied as moot Plaintiffs' motion for preliminary injunctive relief. J.A. 135, 142. The District Court also entered judgment on August 22, 2014. J.A. 143.

On September 8, 2014, Plaintiffs timely filed a notice of appeal. J.A. 144. Because this appeal is from a final order and judgment that disposed of all claims, this Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the District Court erred in holding that Appellees Mike Beebe and Dustin McDaniel, in their official capacities as the Governor and Attorney General of Arkansas, are immune from suit in the present case.

Most Apposite Cases:

- *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006).

- *Reproductive Health Services v. Nixon*, 428 F.3d 1139 (8th Cir. 2005).

- *Missouri Protection & Advocacy Services, Inc. v. Carnahan*, 499 F.3d 803 (8th Cir. 2007).

1

- *Mobil Oil Corp. v. Attorney General of Virginia*, 940 F.2d 73 (4th Cir. 1991).

Most Apposite Constitutional and Statutory Provisions:

- U.S. Const. amend. I.

- 28 U.S.C. § 2403(b).

- Federal Rule of Civil Procedure 5.1.

- Ark. Const. Art. VI, §§ 1, 2, 7.

- Automatic License Plate Reader System Act, 2013 Ark. Acts 1491 (codified at Ark. Code Ann. § 12-12-1801 *et seq.*).

- Ark. Code Ann. § 16-111-106(b).

- Ark. Code Ann. § 25-16-702(a), (b).

- Ark. Code Ann. § 25-16-703(a).

- Ark. Code Ann. § 25-16-704(a).

- Ark. Code Ann. § 25-16-706(a).

- Ark. Code Ann. § 25-16-713(a).

**STATEMENT OF THE CASE**

**A.    Factual Background**

Appellant Vigilant Solutions, Inc. ("Vigilant") develops technology that analyzes photographs and looks for specific content that might be contained within the photograph.  At the most basic level, such image-content analysis is the

2

extraction of meaningful information from a photograph, and it can be achieved either by a human or by a machine such as a digital camera, mobile phone, or computer. Image-content analysis tasks can be as simple as reading a bar-coded tag on food packaging or as sophisticated as detecting cancer in an MRI scan. Vigilant executives have developed a variety of image-content analysis techniques, such as those involving optical character recognition and motion detection.

This case involves a Vigilant-developed technique in which optical character recognition technology is used to analyze license plates. Because this technique is used to locate alphanumeric text displayed on license plates, this application of the technology is sometimes referred to as "automatic license plate reader" or "ALPR" technology. *See* J.A. 7 (¶ 1), 136.

Appellant Digital Recognition Network, Inc. ("DRN") uses photographs and image-content analysis techniques to serve the financial services, insurance, and vehicle repossession industries. J.A. 7 (¶ 1), 10 (¶ 18). DRN's ALPR cameras, which are produced by Vigilant, are typically mounted on tow trucks. *See* J.A. 7 (¶ 2). The cameras take photographs as the camera-equipped vehicles drive on the public roads. J.A. 7 (¶ 2), 10 (¶ 18), 136. In addition to taking photographs, ALPR systems create metadata describing the date, time, and location where each photograph was taken. J.A. 11 (¶ 21), 136. ALPR systems analyze each photograph to determine whether it contains a license plate—and, if it does, an

3

algorithm converts images of text printed on the license plate to computer-readable text. *See* J.A. 9-10 (¶ 17). Software cross-checks the alphanumeric characters from the license plate against a database of license plates registered to vehicles that are sought for recovery by one of DRN's clients, which include automobile lenders and insurance carriers. J.A. 10-11 (¶¶ 19-20), 136. DRN then disseminates the matching license-plate data to its clients, which use it for purposes such as locating cars that should be repossessed and locating cars that have been stolen or fraudulently reported as stolen. J.A. 10-11 (¶ 19), 12 (¶ 24).

DRN also provides ALPR data to Vigilant. In fact, approximately 85% of Vigilant's ALPR data is provided by DRN. Tr. of Aug. 1, 2014 Prelim. Inj. Hr'g at 56 (Dkt. #35) ("PI Tr."). Vigilant shares the DRN-provided data with law enforcement agencies for purposes that range from utilizing near real-time alerts for locating missing persons and stolen vehicles to the use of historical license-plate data to solve major crimes. J.A. 12 (¶ 25), 136.

### B. The Arkansas Automatic License Plate Reader System Act

In 2013, the Arkansas General Assembly enacted the Automatic License Plate Reader System Act ("the Act"). *See* 2013 Ark. Acts 1491 (codified at Ark. Code Ann. § 12-12-1801 *et seq.*). Although Governor Beebe signed the Act,[1] he

---

[1] *See* Lexis History Note Following 2013 Ark. Acts 1491 (April 22, 2013) (noting that the Act was "[a]pproved by the Governor [on] April 22, 2013"); *City & Town:*

4

and Attorney General McDaniel have explicitly disclaimed any knowledge of why the statute was enacted, other than what can be gathered from its text. PI Tr. at 102.

The Act "essentially outlaw[s] the use of ALPR systems," J.A. 137, which are defined as "a system of one (1) or more mobile or fixed automated high-speed cameras used in combination with computer algorithms to convert images of license plates into computer-readable data." Ark. Code Ann. § 12-12-1802(2). Specifically, the Act states that, "[e]xcept as provided in [§ 12-12-1803(b)], it is unlawful for an individual, partnership, corporation, association, or the State of Arkansas, its agencies, and political subdivisions to use an automatic license plate reader system." *Id.* § 12-12-1803(a). This ban on the "use" of ALPR systems precludes Appellants from using such systems to collect license-plate data or from disseminating or disclosing license-plate data that is collected by an ALPR system. However, the Act expressly authorizes the use of an ALPR system by law enforcement agencies, by "parking enforcement entities," and for the purpose of "controlling access to secured areas." *Id.* § 12-12-1803(b).

The Act further provides that "[a] person who violates [the Act] shall be

---

(continued…)

*The Official Publication of the Arkansas Municipal League*, Vol. 69, No. 05 (May 2013), *available at* http://www.arml.org/documents/05_2013_CityNTown_WEB_000.pdf (noting that the Act was "[s]igned by the Governor" on April 22, 2013).

5

subject to legal action for damages to be brought by any other person claiming that a violation of this subchapter has injured his or her business, person, or reputation." Ark. Code Ann. § 12-12-1807(a). "A person so injured shall be entitled to actual damages, or liquidated damages of one thousand dollars ($1,000), whichever is greater, and other costs of litigation." *Id.* § 12-12-1807(b).

It is undisputed—and the District Court expressly found—that, as a result of the Act, Appellants have been forced in Arkansas to cease engaging in constitutionally protected speech that is vital to their operations. J.A. 138 (finding that "the threat of litigation created by the ALPR Act has caused plaintiffs to cease using and/or distributing ALPR systems in Arkansas"); J.A. 136, 138 (finding that "plaintiffs ceased distributing and using ALPR systems in Arkansas when the ALPR Act was adopted," because they had a "reasonable" "fear[ ]" of "extensive litigation"); PI Tr. at 11-12, 57-58; J.A. 12-14 (¶¶ 26-33), 19 (¶¶ 54-55), 80. Because the Act "hangs the threat of litigation over plaintiffs' heads, thus deterring them from engaging in what may be constitutionally protected activity," J.A. 137-38, they filed this action against the Governor and Attorney General in their official capacities.

### C. Procedural History and Summary of the District Court's Decision

Appellants' complaint seeks an injunction and a declaration that the Act violates the First Amendment. J.A. 18-19 (¶¶ 47-57), 137. On the same day they

6

filed this action, Appellants also filed a motion for preliminary injunctive relief and a request for expedited oral argument. *See* J.A. 137; Pls.' Mot. for Prelim. Inj. Relief (Dkt. #2); Pls.' Mem. in Support of Mot. for Prelim. Inj. Relief (Dkt. #3) ("PI Mot."). Appellants argued that the Act's restrictions on their dissemination and collection of license-plate information unconstitutionally infringe speech that is protected by the First Amendment. PI Mot. at 1-6, 13-36.

In addition to opposing Appellants' motion on the merits, Appellees sought to avoid judicial review by contending that there is no Article III case or controversy and that they are immune from suit. *See* J.A. 29-44; Defs.' Br. in Support of Resp. to Mot. for Prelim. Inj. Relief at 4 (Dkt. #22) ("PI Opp'n"). In particular, Appellees contended that they do not have a sufficient connection with the Act—and are therefore shielded by sovereign-immunity principles—because the Act creates a *private* cause of action. *E.g.*, J.A. 37.

On August 1, 2014, the District Court held a hearing on the preliminary injunction motion. Three weeks later, it issued an order, in which it concluded that Appellants have Article III standing and that they have "made fairly compelling arguments in support of their request for injunctive relief." J.A. 136-39. The District Court held, however, that the State may "hang[ ] the threat of litigation over plaintiffs' heads, thus deterring them from engaging in what may be constitutionally protected activity, while at the same time preserving the state's

7

Eleventh Amendment immunity." J.A. 137-38. Specifically, the District Court held that Appellees "are entitled to sovereign immunity because they are not connected to enforcement of the ALPR Act, nor have they threatened to enforce it." J.A. 140. Accordingly, the District Court dismissed the case, denied Appellants' motion as moot, and entered judgment. *See* J.A. 135, 142-43.

In its order, the District Court attempted to distinguish the present case from *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006), in which this Court held that Nebraska's Governor and Attorney General were sufficiently connected with the challenged provision. *Id.* at 863-64; J.A. 141. The District Court reasoned that *Bruning* is irrelevant because "Arkansas law differs . . . from Nebraska law in that Nebraska specifically tasks both the attorney general and the governor with the duty to implement state laws." J.A. 141. The District Court concluded that, "[a]lthough the Arkansas constitution does vest the governor with 'supreme executive power,' it does not give him the authority to enforce all state laws, nor does it task him with the duty to do so." *Id.* Based largely on this analysis, the District Court dismissed the case under the Eleventh Amendment. Plaintiffs appealed.

8

## SUMMARY OF ARGUMENT

As a result of the District Court's sovereign-immunity ruling, Appellants find themselves between Scylla and Charybdis: They must either yield to the State's censorship of their speech or they must expose themselves to millions of dollars of potential liability before raising their First Amendment argument as an affirmative defense in a speech-infringing damages action. The First Amendment, however, prohibits imposing such a current, tangible burden on speech while simultaneously precluding pre-enforcement judicial review.

In an effort to evade judicial review of a law that plainly violates the First Amendment, the Governor and Attorney General insist that they are immune from suit under *Ex Parte Young* because they have no connection with the Arkansas Automatic License Plate Reader System Act ("the Act"), which authorizes damages actions against those who disseminate or collect automatic license plate reader ("ALPR") data in violation of the Act, including automatic "liquidated" damages of $1000 each time a license plate is photographed using an ALPR system. If this argument is accepted, this means that Appellants will have no ability to have the constitutionality of the Act adjudicated until after they have been exposed to massive financial liability under that statute, because Appellees cannot point to *any* state official with a sufficient "connection" to the Act to satisfy their view of *Ex Parte Young*.

9

Thus, under Appellees' interpretation of *Ex Parte Young*, any state, through the simple expedient of enforcing a speech restriction through a private cause of action, can impose on American citizens a facially unconstitutional speech ban while simultaneously depriving them of any ability to challenge the speech burden before they have been subjected to millions of dollars in liability and been sued by private litigants.  As the District Court correctly noted, Appellees' *Ex Parte Young* analysis empowers Arkansas to "hang[ ] the threat of litigation over plaintiffs' heads, thus deterring them from engaging in what may be constitutionally protected activity, while at the same time preserving the state's Eleventh Amendment immunity."  J.A. 137-38.  Thus, "this is a classic case of the state of Arkansas 'throwing a rock and hiding its hands,'" which means that the State has "take[n] an action but does not want to suffer the consequences of that action."  J.A. 137.  But, contrary to the District Court's conclusion, *Ex Parte Young* does not provide a license for the State to so impose a current tangible burden on speech and close the courthouse doors to citizens seeking relief from that ongoing injury.

The Act's burden on speech concededly injures Appellants *now*, which is why the District Court correctly found that they had standing.  J.A. 80, 137-38.  Since there is a "case or controversy" with the State that censors Appellants' constitutionally protected speech today, federal courts have a "virtually unflagging" "obligation" to resolve and remedy this current constitutional violation.  *Susan B.*

10

*Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014) (hereinafter "*SBA List*").

The State cannot eliminate that jurisdiction, and immunize the speech restriction it statutorily imposed, simply by deputizing private vehicle owners to enforce the State's speech-suppressing regime. Under Appellees' contrary view of *Ex Parte Young*, the Arkansas General Assembly could shield a statute imposing $10,000 penalties on anyone who "criticizes" the Governor or Legislature from any pre-enforcement challenge, simply by authorizing private rights of action by any person "offended" by the criticism. Similarly, a law authorizing Arkansas citizens to sue anyone for liquidated damages if the speaker makes a statement that is "politically offensive" to the listener would escape pre-enforcement review under the District Court's approach.

As the Supreme Court has repeatedly confirmed, however, the Constitution does not tolerate a regime where speakers are required to make a Hobson's Choice between refraining from constitutionally protected speech or subjecting themselves to substantial civil penalties—which is why pre-enforcement challenges are authorized *before* liability under the allegedly unconstitutional statute has occurred. And certainly nothing in *Ex Parte Young*, which "rests on the need to promote the *vindication* of federal rights," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (emphasis added), requires the judiciary to endorse and accept such naked speech suppression.

11

To the contrary, *Ex Parte Young* was simply designed to ensure that plaintiffs sue the *appropriate* state official—an official who has "some connection with the challenged law"—it does not authorize the State to preclude *all* adjudication of current cases or controversies by deputizing private citizens to enforce the statutes through a liquidated damages provision. *See 281 Care Committee v. Arneson*, 638 F.3d 621, 633 (8th Cir. 2011) (internal quotation marks omitted) ("*281 Care Committee I*"). Here, the Attorney General and the Governor are clearly appropriate state officials and, particularly in these circumstances, have more than sufficient connections to the Act to satisfy *Ex Parte Young* under binding Circuit precedent.

Most obviously, this Court's decision in *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006), demonstrates that the authority of the Governor and Attorney General to enforce Arkansas law creates a sufficient connection with the Act. In *Bruning*, plaintiffs challenged Nebraska's ban on same-sex marriage by suing Nebraska's Governor and Attorney General, even though those officials did not administer the ban and did not have a direct conflict with plaintiffs. This Court nonetheless held that the Governor and Attorney General had a sufficient connection for *Ex Parte Young* purposes due to their broad, general powers "to enforce the State's Constitution and statutes," by means such as advising the Legislature on the constitutionality of a bill. *Id.* at 864. Contrary to

12

the District Court's conclusion, *Bruning* is dispositive here because the connection that Arkansas's Governor and Attorney General have with the Act is at least as strong, if not stronger, than the connection that Nebraska's Governor and Attorney General had with the same-sex-marriage ban in *Bruning*.

Even if a more specific connection with the Act were required, this Court's decisions in *Reproductive Health Services v. Nixon*, 428 F.3d 1139 (8th Cir. 2005), and *Missouri Protection & Advocacy Services, Inc. v. Carnahan*, 499 F.3d 803 (8th Cir. 2007), plainly establish that the Attorney General has such a connection because of the high (indeed, virtually certain) likelihood that he will be a litigant in any private enforcement action under the Act. In *Reproductive Health Services* and *Missouri Protection & Advocacy*, the Court found that the Missouri Attorney General had a "sufficient connection" because of the contingent possibility that the assigned county attorney might request, and the Governor might direct, the Attorney General to assist the county attorney in the local criminal prosecutions by which the relevant laws were enforced. *Mo. Protection & Advocacy*, 499 F.3d at 807 (citing Mo. Rev. Stat. § 27.030); *Reproductive Health Servs.*, 428 F.3d at 1145. Here, the Attorney General has a unilateral right to intervene, without any action by third parties, in civil proceedings under the Act that implicate the Act's constitutionality and, in stark contrast to *Reproductive Health Services* and *Missouri Protection & Advocacy*, it is virtually certain that he will so intervene in

13

such private enforcement actions. The only issue in private suits enforcing the Act against Appellants will not be the *statutory* liability question of whether Appellants' ALPR systems photographed license plates, but the *constitutional* question of whether the statutory liability comports with the First Amendment. Obviously, the Attorney General will not entrust the constitutional defense of a sovereign state enactment to whatever vehicle owner has his license plate photographed by an ALPR system, so he will undoubtedly intervene.

Since the Attorney General has a sufficient connection to the Act's constitutionality to intervene as of right in cases involving the Act's constitutionality, he also has a sufficient connection to declaratory judgment suits challenging the Act's constitutionality—particularly because he will inevitably exercise that right to intervene in any private suit under the Act. After all, the only question is whether the Attorney General will defend the Act's constitutionality in *this* suit by Appellants, or do so as an intervening plaintiff in a suit *after* Appellants have suffered the constitutional injury that pre-enforcement declaratory judgment challenges are expressly designed to avoid—*i.e.*, exposure to "costly . . . proceedings" (indeed, ruinous liability) in order to bring a (presumptively) meritorious First Amendment challenge. *See SBA List*, 134 S. Ct. at 2347.

For this reason, this is a far easier case than *Bruning*, *Reproductive Health Services*, or *Missouri Protection & Advocacy* because, in all of those cases, a

14

determination that the Attorney General had an insufficient connection for *Ex Parte Young* purposes simply would have meant that such suits could go forward if plaintiffs named the appropriate government officials—*i.e.*, the local officers actually administering and enforcing the statutes being challenged. It would not, as here, close the courthouse doors on plaintiffs, thereby imposing on them the Hobson's Choice that the Supreme Court has consistently said is intolerable.

In any event, in addition to participating as an *intervening* plaintiff, the Attorney General has the authority to directly sue Appellants for violations of the Act, by bringing "public nuisance" or Deceptive Trade Practices Act enforcement actions against them, on the ground that ALPR systems are contrary to "statute" or "public policy" or are injurious to the "rights of the public on highways." And there is also a significant possibility that he will be involved in defending lawsuits brought against him or other state actors pursuant to the Act.

Finally, in addition to the fact that the Governor is responsible for the execution and enforcement of the State's laws, he has a sufficient connection with the Act because he could order the Attorney General to not defend its constitutionality.

In sum, the District Court's myopic and illogical application of *Ex Parte Young* to force Appellants to litigate against the Attorney General concerning the Act's constitutionality after they have exposed themselves to crippling liability,

15

rather than litigating its constitutionality against him in this declaratory judgment action before they have suffered that unconstitutional burden, does nothing to further the purposes of the Eleventh Amendment and severely undermines the guarantees of the First Amendment.

## ARGUMENT

The District Court's sovereign-immunity ruling precludes Appellants from obtaining pre-enforcement judicial review of a speech-infringing statute simply because that statute creates private rights of action instead of criminal penalties. Section I of this brief discusses the constitutional rule that a speaker may bring a pre-enforcement challenge to a speech-suppressing law so long as there is a credible threat of enforcement. Section II explains why the *Ex Parte Young* standard should not be used to create an insuperable obstacle to pre-enforcement review whenever the speech-suppressing law creates a private cause of action. Finally, Section III demonstrates that the Arkansas Attorney General and Governor are adequately connected to the Act for *Ex Parte Young* purposes under binding Circuit precedent.

Standards of Review:

The District Court's dismissal of this case on a jurisdictional basis is reviewed *de novo*. *Zanders v. Swanson*, 573 F.3d 591, 593 (8th Cir. 2009); *281 Care Committee I*, 638 F.3d at 627. Moreover, this Court should "accept as true all

16

material allegations in the complaint and construe the facts in the light most favorable to the plaintiffs below, here Appellants." *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 484 n.1 (8th Cir. 2006); *see also United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009).

## I.   THE FIRST AMENDMENT DOES NOT TOLERATE THE IMPOSITION OF A HOBSON'S CHOICE ON SPEAKERS BY CLOSING THE COURTHOUSE DOORS TO THEM UNTIL AFTER THEY HAVE BEEN EXPOSED TO LIABILITY UNDER A SPEECH-SUPPRESSING LAW.

Speakers should not be forced to face crippling liability under a speech-suppressing law before they can obtain judicial review of the law's constitutionality.  Indeed, courts routinely engage in pre-enforcement review of speech-suppressing laws, based simply on the existence of a suppressive statute that plaintiff's speech arguably violates, and a credible threat of enforcement.  *E.g.*, *SBA List*, 134 S. Ct. at 2342; *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 302 (1979); *281 Care Committee v. Arneson*, 766 F.3d 774, 781-82 (8th Cir. 2014) ("*281 Care Committee II*"); *281 Care Committee I*, 638 F.3d at 627-28; *Gaertner*, 439 F.3d at 485; *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996); *cf. Mobil Oil Corp. v. Att'y Gen. of Va.*, 940 F.2d 73, 74 (4th Cir. 1991).  The reason for such *pre-enforcement* challenges is that "denying prompt judicial review would impose a substantial hardship on [speakers], forcing them to choose between refraining from" constitutionally protected "speech on the one hand, or

17

engaging in that speech and risking costly . . . proceedings" on the other. *SBA List*, 134 S. Ct. at 2347; *see also, e.g.*, *Mobil Oil*, 940 F.2d at 74 (concluding that the "predicament" of "submit[ting] to a statute or fac[ing] the likely perils of violating it . . . is precisely why the declaratory judgment cause of action exists"). In fact, that is why this Court has explicitly "'encourage[d] a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution.'" *Gaertner*, 439 F.3d at 488 (quoting *Mobil Oil*, 940 F.2d at 75).

Thus, "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Gardner*, 99 F.3d at 15; *see also Gaertner*, 439 F.3d at 485 ("credible" threat of enforcement exists so long as the threat is "not imaginary or wholly speculative"); *Babbitt*, 442 U.S. at 302. This presumption can be overcome only by "evidence—via official policy or a long history of disuse—that authorities actually reject a statute." *281 Care Committee I*, 638 F.3d at 628; *see SBA List*, 134 S. Ct. at 2345; *Babbitt*, 442 U.S. at 302; *Gaertner*, 439 F.3d at 485; *281 Care Committee II*, 766 F.3d at 797 (holding

18

that the Minnesota Attorney General was immune because he "testified with assurances that [his] office" would not "assist in the prosecution" of the challenged law).

The fact that a suppressive statute creates a threat of civil suits instead of criminal prosecution does not alter this analysis. On the contrary, it is well settled that "[t]he fear of damage awards" in a civil action "may be markedly more inhibiting than the fear of prosecution under a criminal statute." *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964); *see also SBA List*, 134 S. Ct. at 2345; *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-130, 134 n.12 (2007). Indeed, the Supreme Court recently reaffirmed in *SBA List* that the fear of civil liability has a *more substantial* inhibiting effect on speech than does the threat of prosecution. 134 S. Ct. at 2345 (concluding that "[t]he credibility of [the] threat" of enforcement was "*bolstered* by the fact that authority to file a complaint with the Commission [was] not limited to a prosecutor or an agency") (emphasis added); *see also, e.g.*, *New York Times*, 376 U.S. at 278; *281 Care Committee II*, 766 F.3d at 781, 790. Likewise, in *281 Care Committee II*, this Court found it "immensely problematic that *anyone* may lodge a complaint" alleging a violation of the statute. 766 F.3d at 790 (emphasis in original).

The present case is a textbook situation in which Appellants face a Hobson's Choice that gives rise to a present injury for standing purposes. On the one hand,

19

Appellants could refrain from engaging in constitutionally protected speech in Arkansas, in which case the Act's burden on speech would have succeeded in silencing Appellants. On the other hand, Appellants could choose to exercise their First Amendment rights in Arkansas in defiance of the Act, in which case they plainly would be exposed to what is, at a minimum, a credible threat that they will suffer substantial damages under the Act's civil liability provision. Since *either* compliance with *or* defiance of the Act imposes a current injury, speakers suffer cognizable Article III injury *before* speech-restricting laws are actually *enforced* against them.

Appellees have not even tried to overcome the presumption that Appellants face a credible threat of enforcement that gives rise to a present Article III injury, in light of the Act's authorization of thousands (or millions) of citizens throughout Arkansas to sue Appellants. Nor have Appellees disclaimed an intent to intervene and defend the Act's constitutionality if it is challenged in a suit brought against Appellants under the Act. Indeed, Appellees essentially concede that Appellants face a credible threat of civil suits being filed against them pursuant to the Act. J.A. 80 (Appellees' statement that they "assume[ ] that the Plaintiffs have or will suffer an injury" and that "enforcement by someone could be imminent") (emphasis omitted).

Moreover, the threat faced by Appellants here is particularly acute because

20

violating the statute would expose them to millions of dollars of potential liability. The potential litigation exposure that Appellants would face if they were to resume operations in Arkansas is substantial because (1) the universe of potential plaintiffs is vast, in light of the vast number of license-plate numbers that will be photographed by Appellants' ALPR systems;[2] (2) if Appellants were to use ALPR systems in Arkansas, "enforcement" could, as Appellees concede, "be imminent," J.A. 80; and (3) the Act provides for "actual damages or liquidated damages of one thousand dollars ($1,000), whichever is greater," for *each* license-plate number recorded using an ALPR system. Ark. Code Ann. § 12-12-1807(b).

For these reasons, it is undisputed that Appellants are suffering a current injury. Indeed, the District Court expressly found that Appellants face a credible threat of civil suits being filed against them under the Act. J.A. 138 ("[T]he record indicates that the threat of litigation created by the ALPR Act has caused plaintiffs to cease using and/or distributing ALPR systems in Arkansas. This self-censorship is objectively reasonable . . . ."). The District Court therefore held that Appellants have a live case or controversy with officials of the State of Arkansas. J.A. 138-39.

In light of the District Court's correct holding that Appellants have a live

---

[2] *See, e.g.*, J.A. 10 (¶ 18); PI Tr. at 14 (testimony indicating that approximately 15.8 million license-plate photographs were taken by ALPR systems used by DRN's camera affiliates within California in June 2014); PI Opp'n at 2 (stating that Appellants "record thousands of images each day").

21

controversy with Appellees, it makes no sense to conclude that they cannot bring this pre-enforcement challenge (against Appellees or any other state official) under *Ex Parte Young*. After all, "'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'" *SBA List*, 134 S. Ct. at 2347. More specifically, since the Governor and Attorney General are sufficiently connected with the Act for Article III purposes, they are also sufficiently connected for Eleventh Amendment purposes. Indeed, this Court's analysis in *Bruning* says as much. *See* 455 F.3d at 864 ("[W]e agree" that "the Governor and the Attorney General have 'some connection with the enforcement' of § 29 and therefore this suit for equitable relief falls within the exception to the State's Eleventh Amendment immunity established in *Ex parte Young*, 209 U.S. 123, 157 (1908). This satisfies the case or controversy requirement of Article III.").

In all events, as we presently discuss, the District Court's *Ex Parte Young* analysis was not only inconsistent with the above-described principles relating to Article III and the First Amendment, but was also incorrect on its own terms, as binding Circuit precedent makes clear.

## II. THE *EX PARTE YOUNG* DOCTRINE IS DESIGNED TO IDENTIFY THE APPROPRIATE STATE DEFENDANT, NOT TO PRECLUDE LIVE CONTROVERSIES WITH THE STATE FROM BEING TIMELY ADJUDICATED.

Under *Ex Parte Young*, state officials can be sued in their official capacities to enjoin a prospective action that would violate federal law. *See, e.g.*, *Ex Parte*

*Young*, 209 U.S. at 160; *Pennhurst*, 465 U.S. at 102; *281 Care Committee I*, 638 F.3d at 632; *Bruning*, 455 F.3d at 863-64; *Reproductive Health Servs.*, 428 F.3d at 1145.

"Here, there is no dispute that the relief plaintiffs seek is prospective." *281 Care Committee I*, 638 F.3d at 632. Thus, the relevant question is whether the Attorney General and Governor have "'some connection' with the challenged law," so as to fall within the scope of the *Ex Parte Young* exception. *See id.* at 633; *see also Reproductive Health Servs.*, 428 F.3d at 1145-46; *Missouri Pro. & Advocacy Servs.*, 499 F.3d at 807. The inquiry into whether "some connection" exists is not particularly stringent. "Primarily, the requirement has been a bar to injunctive actions where the relationship between the state official sought to be enjoined and the enforcement of the state statute is *significantly attenuated*." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008) (emphasis added). Moreover, the requisite connection can arise out of either the general law or the specific statute at issue. *Ex Parte Young*, 209 U.S. at 157, 158 (holding that the requisite connection "might exist by reason of the general duties of the officer to enforce it as a law of the State").

The "some connection" standard is designed to prevent random, unconnected state officials from erroneously being named as defendants in a suit challenging state law. In other words, this standard "ensures that *the appropriate*

23

*party* is before the federal court." *S.C. Wildlife Fed'n*, 549 F.3d at 332-33 (emphasis added). For example, this standard would ensure that an Arkansas inmate challenging his confinement conditions could sue the relevant warden or other prison official, but could not sue the Director of the Arkansas State Police. The "some connection" standard is *not*, however, a device through which state officials can claim that there is *no* appropriate party because no official has a connection with the state law at issue. In fact, this Court's recent decision in *281 Care Committee II* confirms the point that the role of *Ex Parte Young*'s "some connection" standard is to ensure that the state officials with the strongest connection to the challenged law are named as defendants. *See 281 Care Committee II*, 766 F.3d at 780, 796-97 (holding that the Minnesota Attorney General did not have a sufficient connection with the challenged law, but that the case could proceed against two county attorneys).

Notably, the Supreme Court has opined that "the policies underlying the decision in *Ex parte Young*" should be used by courts in determining whether a suit should be allowed to proceed under that doctrine. *Papasan v. Allain*, 478 U.S. 265, 279 (1986). It is, therefore, significant that the Court's "decisions repeatedly have emphasized that the [*Ex Parte*] *Young* doctrine rests on the need to promote the vindication of federal rights." *Pennhurst*, 465 U.S. at 105. Accordingly, it should not be used, if at all possible, to deny plaintiffs a forum to challenge current,

24

ongoing First Amendment injury.[3]

## III. THE ATTORNEY GENERAL AND GOVERNOR HAVE SUFFICIENT CONNECTIONS WITH THE ACT FOR THE PURPOSES OF *EX PARTE YOUNG.*

### A. Binding Precedent Dictates That the Governor and Attorney General Have "Some Connection" with the Act Due to Their Authority to Execute and Enforce State Law, Including the Attorney General's Authority to Advise the Legislature and State Agencies.

This Court's decision in *Bruning* conclusively demonstrates that the well-established authority of the Governor and Attorney General to enforce the laws of Arkansas establishes a sufficient connection with the Act's enforcement for *Ex Parte Young* purposes. In *Bruning*, plaintiffs challenged Nebraska's ban on same-sex marriage by suing Nebraska's Governor and Attorney General, even though those officials did not administer the ban and did not have a direct conflict with plaintiffs. 455 F.3d at 863-64. In fact, the provision challenged in *Bruning* did "not require affirmative enforcement by any state official." *Id.* at 864. Moreover, the county clerks—not the Governor and Attorney General—were responsible for issuing marriage licenses. *See id.*; Neb. Rev. Stat. §§ 42-104, 42-106. Nevertheless, this Court held that the Governor and Attorney General had a

---

[3] *See* Caitlin Borgmann, *Legislative Arrogance and Constitutional Accountability*, 79 S. Cal. L. Rev. 753, 776-84 (2006); Maya Manion, *Privatizing Bans on Abortion: Eviscerating Constitutional Rights Through Tort Remedies*, 80 Temp. L. Rev. 123, 128, 165-98 (2007).

25

sufficient connection for *Ex Parte Young* purposes due to their broad, general powers "to enforce the State's Constitution and statutes."  455 F.3d at 864.  For example, the fact that the Attorney General provided an opinion to the Legislature that a bill would violate the challenged constitutional provision "confirm[ed] that these broad powers include policing compliance with this constitutional amendment."  *Id.*  Accordingly, this Court concluded that "the Governor and the Attorney General have 'some connection with the enforcement' of [the challenged provision] and therefore this suit for equitable relief falls within . . . *Ex Parte Young*" and "satisfies the case or controversy requirement of Article III."  *Id.*

*Bruning* reflects longstanding Supreme Court precedent demonstrating that the general authority to supervise or enforce the law is sufficient for *Ex Parte Young* purposes.  In *Ex Parte Young*, the Court explained that the requisite connection "might exist by reason of the *general duties* of the officer to enforce [the challenged statute] as a law of the State."  *Ex Parte Young*, 209 U.S. at 158 (emphasis added).  The Court thus reaffirmed its prior holding from *Smyth v. Ames*, 169 U.S. 466 (1898), in which the Court had held that Nebraska's Attorney General had a sufficient connection with the challenged statute because, "under his *general powers*[,] he had authority to ask for a mandamus to enforce such [statute] or any other law."  *Ex Parte Young*, 209 U.S. at 154 (discussing *Smyth*) (emphasis added).  The Supreme Court unanimously reaffirmed this result in *Papasan*, which

26

held that a secretary of state was a proper defendant under *Ex Parte Young* because he had "*'general supervision' of the administration* by the local school officials" who managed the lands at issue. 478 U.S. at 281-82 & n.14 (emphasis added); *see id.* at 292 (Brennan, J., concurring in part, concurring in the judgment in part, and dissenting in part).[4]

 *Bruning* therefore clearly establishes that a Governor and Attorney General have a sufficient "connection" to a statute they do not either enforce or administer, because of their broad powers to "enforce the State's Constitution and statutes." 455 F.3d at 864. This holding is dispositive here. The District Court only evaded *Bruning* based on a facially erroneous distinction between the powers vested by the Nebraska Constitution in *Bruning* and the more limited powers and responsibilities purportedly bestowed by the Arkansas Constitution. Specifically, the District Court reasoned as follows:

---

[4] Numerous other cases illustrate the same point. *See, e.g.*, *S.C. Wildlife Fed'n*, 549 F.3d at 333 ("As the *administrative head* of the agency with responsibility for carrying out its policies and representing the agency in its dealings with the federal government, the Director possesses a sufficient connection to the alleged violation of federal law.") (emphasis added); *Gardner*, 99 F.3d at 13; *see also Kitchen v. Herbert*, 755 F.3d 1193, 1204 (10th Cir. 2014) ("[A] state official is a proper defendant if he is responsible for *general supervision of the administration* by the local officials of a challenged provision.") (internal quotation marks, citation, and ellipsis omitted; emphasis added); *id.* at 1202-04 (holding that Utah's Governor and Attorney General have the requisite connection with the challenged constitutional provision, largely due to their supervisory and removal authorities over county clerks and state agencies).

27

> Arkansas law differs . . . from Nebraska law in that Nebraska specifically tasks both the attorney general and the governor with the duty to implement state laws. *See* Neb. Const. Art. IV, § 6; *See* Neb. Rev. Stat. § 84-731. Although the Arkansas constitution does vest the governor with 'supreme executive power,' it does not give him the authority to enforce all state laws, nor does it task him with the duty to do so. *See* Ark. Const. Art. VI, § 2.

J.A. 141. This, however, is flatly incorrect. Indeed, the Arkansas Governor and Attorney General possess powers that, as relevant here, are at least as robust as the authorities of the Nebraska Governor and Attorney General.

At the threshold, contrary to the District Court's analysis, the relevant language in Nebraska's Constitution is virtually identical to the language in Arkansas's Constitution. Like the Nebraska Constitution, the Arkansas Constitution vests in the Governor the "supreme executive power." Neb. Const. Art. IV, § 6 ("The supreme executive power shall be vested in the Governor . . . ."); Ark. Const. Art. VI, § 2 ("The supreme executive power of this State shall be vested in a chief magistrate, who shall be styled 'the Governor of the State of Arkansas.'"). And like the Nebraska Constitution, the Arkansas Constitution bestows on the Governor the responsibility to see that state laws are "faithfully executed." Neb. Const. Art. IV, § 6 ("[T]he Governor . . . shall take care that the laws be faithfully executed . . . ."); Ark. Const. VI, § 7 (providing that the

28

Governor "shall see that the laws are faithfully executed").[5]

In light of this clear command to faithfully execute the laws, the Arkansas Supreme Court has repeatedly held that the Arkansas Constitution tasks the executive branch—which includes both the Governor and Attorney General, *see* Art. VI, §§ 1-2—with "the power and responsibility to *enforce* the laws." *Weiss v. Maples*, 253 S.W.3d 907, 913 (Ark. 2007) (emphasis added); *see also State v. D.S.*, 378 S.W.3d 87, 90-92 (Ark. 2011); *Fulkerson v. Refunding Bd. of Ark.*, 147 S.W.2d 980, 986 (Ark. 1941) (noting "the duty of the executive department to enforce" the law); *State v. McDiarmid*, 27 Ark. 176, 182 (1871) ("The Constitution enjoins it upon the executive to see that the laws are faithfully executed . . . ."); *Hawkins v. Governor*, 1 Ark. 570, 591 (1839) (noting the duty to "see that the laws are faithfully executed"). Simply put, the highest court in Arkansas has made it crystal clear that the executive branch "*execute[s]* and *implement[s]* laws passed

---

[5] The Nebraska statute cited by the District Court does not alter the analysis, inasmuch as it merely clarifies that, "*[p]ursuant to his constitutional duty to take care that the laws be faithfully executed*, whenever it shall come to the attention of the [Nebraska] Governor that any agency charged with the implementation of any act of the Legislature is failing to implement such act, he shall immediately in writing order the agency to commence implementation unless" one of three specified circumstances exists. *See* Neb. Rev. Stat. § 84-731 (emphasis added); *id.* (further providing that when the Governor issues such a letter to an agency, "[h]e shall furnish a copy of such letter to the Attorney General together with a written order to commence or cause to be commenced an action in a court of competent jurisdiction to compel implementation if the agency has not, within ten working days, commenced implementation").

Appellate Case: 14-3084     Page: 40     Date Filed: 10/21/2014 Entry ID: 4208319

by the General Assembly." *State Bd. of Workforce Educ. & Career Opportunities v. King*, 985 S.W.2d 731, 736 (Ark. 1999) (emphasis added); *see also Rockefeller v. Hogue*, 429 S.W.2d 85, 90 (Ark. 1968) (noting that Arkansas's Governor is "the chief of the executive branch of the government"). Indeed, Attorney General McDaniel has expressly advised Governor Beebe that "the executive is bound to see that the laws are faithfully executed." Ark. Op. Att'y Gen. No. 2009-040, 2009 Ark. A.G. LEXIS 165, at *10 (Apr. 17, 2009); *see also* Ark. Op. Att'y Gen. No. 81-70, 1981 Ark. A.G. LEXIS 167, at *8 (Mar. 27, 1981) ("The executive branch has the power and responsibility to enforce the law . . . ."). The Governor also has authority relating to the removal of the Attorney General, *see* Ark. Const. Art. XV, § 3, who is part of the executive branch, *see* Ark. Const. Art. VI, § 1. And the Governor has the power to direct the Attorney General's handling of constitutional litigation. *See Lake View Sch. Dist. No. 25 v. Huckabee*, 340 Ark. 481, 490 (2000); *see also infra* at § III.C (discussing this point in further detail).

With respect to the Attorney General specifically, he correctly describes himself as "Arkansas's chief law *enforcement* officer." Arkansas Attorney General: Our Office – Departments, *available at* http://arkansasag.gov//our-office/departments/ (last visited Oct. 17, 2014) (emphasis added). And he does so for good reason: by statute, "[t]he office of the Attorney General is designated as a law *enforcement* agency." Ark. Code Ann. § 25-16-713(a) (emphasis added).

30

Like the Nebraska Attorney General in *Bruning*, the Arkansas Attorney General is sufficiently connected with the Act because of his role in advising the General Assembly about the constitutionality of legislation. *See Bruning*, 455 F.3d at 864. "When requested," the Arkansas Attorney General "shall . . . give his or her opinion to either house of the General Assembly and any member thereof upon the constitutionality of any proposed bill and to all state boards and commissions upon any question connected with the discharge of the duties of those boards and commissions." Ark. Code Ann. § 25-16-706(a)(3); *see* Ark. Att'y Gen. Op. No. 2003-165 (Aug. 28, 2003) (opinion of then-Attorney General, and now-Governor, Mike Beebe, as to the validity under the First Amendment of legislation relating to license plates).

Inasmuch as *Bruning* held that "policing compliance" with a provision by advising the Legislature about its constitutionality establishes a sufficient connection for *Ex Parte Young* purposes, it follows *a fortiori* that advising state executive agencies about the law at issue establishes a sufficient connection. It is thus relevant that the Arkansas Attorney General is responsible for providing "advice" to "state officials, departments, institutions, and agencies." Ark. Code Ann. § 25-16-702(b)(1). "Upon request," he is required to "give his or her opinion to the Governor and to the heads of the executive departments . . . upon any constitutional or other legal question that may concern the official action of those

31

officers." *Id.* § 25-16-706(a). Further underscoring this point, the Attorney General describes one of his responsibilities as "provid[ing] day-to-day counseling, advice, and representation for state agencies." Attorney General: Representing State Agencies, *available at* http://arkansasag.gov/programs/arkansas-lawyer/representing-state-agencies/ (last visited July 7, 2014). As noted above, law enforcement agencies and certain other governmental agencies in Arkansas are authorized to use ALPR systems, subject to certain conditions. *See, e.g.*, Ark. Code Ann. §§ 12-12-1803(b), 12-12-1804(a), (b). Consequently, the Attorney General is charged with advising, and policing the compliance of, the agencies that use ALPR systems. *See, e.g.*, *id.* §§ 25-16-702(b)(1), 25-16-706(a).

Accordingly, because Arkansas law is, as relevant here, materially indistinguishable from the Nebraska law at issue in *Bruning*, the present case is controlled by this Court's disposition of *Bruning*. In fact, the case for allowing the present action to proceed against the Governor and Attorney General is even stronger than it was in *Bruning*. If the Governor and Attorney General had been immune in *Bruning*, the plaintiffs still would have been able to obtain judicial review by naming the county clerks as defendants. *See, e.g.*, *Bruning*, 455 F.3d at 864; *Kitchen v. Herbert*, 755 F.3d 1193, 1202-04 (10th Cir. 2014). In the present case, however, Appellants have been denied *any* pre-enforcement review of a blatantly unconstitutional speech restriction.

32

In short, *Bruning* is dispositive here: Appellees' authorities to enforce state law provide the requisite connection for *Ex Parte Young* purposes.

**B.  Even if a More Specific Connection with the Act Is Required, the Attorney General Clearly Has Such a Connection Because He Will Certainly Be a Litigant in a Case Addressing the Constitutionality of the Act.**

Even if this Court were to conclude that a more specific connection with the Act is required, Appellants can readily satisfy such a requirement here because the Attorney General surely will be a litigant in a case addressing the Act's constitutionality, either as an intervenor in a private plaintiff's suit under the Act or in his own direct enforcement action, which is available to him even though the Act itself does not expressly vest him with such power.  This case therefore presents the precise situation for which declaratory judgment actions were created—namely, making putative plaintiffs the defendants in an action *now*, instead of forcing the aggrieved parties to await a lawsuit by the putative plaintiffs. *See SBA List*, 134 S. Ct. at 2347; *Mobil Oil*, 940 F.2d at 74, 75.

**1. The Attorney General is connected to the Act because he has a right to intervene and participate in any suit where the Act's constitutionality is challenged, including in a private damages action filed against Appellants under the Act.**

The Attorney General has a direct and obvious connection to the Act's enforcement because federal and state law grant him the right to intervene, to be heard, and to participate fully in any proceeding in which the constitutionality of a

33

state statute is called into question. Under Arkansas law, "[i]n any proceeding" in which a "statute, ordinance, or franchise is alleged to be unconstitutional, the Attorney General of the state shall also be served with a copy of the proceeding and be entitled to be heard." Ark. Code Ann. § 16-111-106(b). In addition, the Attorney General has an affirmative duty to defend the State's interests in federal court. *See id.* § 25-16-703(a). In fact, the Attorney General's role when intervening and defending a statute's constitutionality is so critical that the Arkansas Supreme Court reversed an order declaring a statute unconstitutional where the Attorney General had not been given notice and an opportunity to be heard. *Ark. Dep't of Human Servs. v. Heath*, 817 S.W.2d 885, 886 (Ark. 1991).

Federal law likewise ensures that the Attorney General will be intimately involved in any federal litigation that calls into question the constitutionality of a state statute. As a matter of federal statute, the Attorney General is entitled to be notified and to intervene in federal cases questioning the constitutionality of a state statute. 28 U.S.C. § 2403(b). Moreover, when the Attorney General intervenes, he generally enjoys "all the rights of a party," including those relating to "presentation of evidence" and "argument on the question of constitutionality," insofar as is "necessary for a proper presentation of the facts and law relating to the question of constitutionality." *Id.* Federal Rule of Civil Procedure 5.1 also provides that a party filing a constitutional challenge to a state statute must promptly notify the

34

state attorney general if that state statute's constitutionality is being questioned. Fed. R. Civ. P. 5.1(a)(1), (a)(2), (b).

In light of this right to automatically intervene, it is all but certain that the Attorney General will be involved in any private damages action against DRN and Vigilant under the Act. In such a case, it is extraordinarily unlikely that there would be any dispute as to *statutory liability* under the Act. The *only* issue in dispute would be the Act's constitutionality. The Attorney General would have a right to intervene and opine about the statute's constitutionality. And there is no doubt that the Attorney General would so intervene; after all, he has vigorously defended the constitutionality of the Act in this case, and he surely would not leave such a weighty issue in the hands of an Arkansas citizen-plaintiff whose license plate has been photographed.

Consequently, this Court's precedent in *Reproductive Health Services* and *Missouri Protection & Advocacy* establishes that the Attorney General clearly has a sufficient connection to the Act to satisfy the Eleventh Amendment. In both cases, this Court held that the Attorney General was a proper defendant in a declaratory judgment action challenging a state law's constitutionality even though the Attorney General's ability to enforce the challenged statute was *contingent* on the actions of *third parties* and the *likelihood* of such contingencies occurring was far less than the likelihood that the Attorney General here will become involved in

35

a private enforcement action under the Act.

Specifically, in *Reproductive Health Services*, plaintiffs filed a constitutional challenge against Missouri's "informed consent" statute, which made violations of the statute a misdemeanor and which subjected physicians who violated the law to license revocation. 428 F.3d at 1141-42. The Missouri Attorney General "argue[d] that he [was] not sufficiently connected with enforcement of [the statute] because he has no power to initiate misdemeanor prosecutions, a task left to local prosecutors, and no power to take adverse licensing actions, a task left to professional licensing boards." *Id.* at 1145. Notwithstanding this absence of enforcement authority, this Court held that he had a "sufficient connection with the enforcement of [the statute]" to bring him "within the scope of the *Ex parte Young* exception" because he had the statutory authority "to aid prosecutors when so directed by the Governor, and to sign indictments 'when so directed by the trial court.'" *Id.* (emphasis and internal quotation marks omitted). Thus, in *Reproductive Health Services*, the Missouri Attorney General's contingent involvement in litigation afforded a sufficient "connection" with the challenged statute, even though he "had no authority to initiate criminal prosecution" and he "could only participate in a criminal proceeding if his assistance was requested by the assigned county attorney or the trial court asked him to sign indictments." *281 Care Committee I*, 638 F.3d at 633 (discussing *Reproductive Health Services*, 428

36

F.3d at 1145-46).

Moreover, in *Missouri Protection & Advocacy*, the Court found that the Attorney General had a sufficient "connection" to enforcement based on a potential enforcement role that was even more contingent and unlikely than that present in *Reproductive Health Services*. There, the Attorney General was sued in a challenge to Missouri laws which denied the right to vote to those adjudicated "incapacitated." 499 F.3d at 805-07. Although enforcement of this prohibition was committed to "*local* 'election authorities,'" the Attorney General was sufficiently connected to the challenged law because *if* an incapacitated person attempted to vote *knowing* he was ineligible, he would then be subject to criminal prosecution, which might involve the Attorney General *if* county attorneys requested and the Governor directed his assistance under the Missouri laws referenced in *Reproductive Health Services*. *Id.* at 807 (emphasis added); Mo. Rev. Stat. § 27.030 ("When directed by the governor, the attorney general . . . shall aid any prosecuting attorney or circuit attorney in the discharge of their respective duties in the trial courts and in examinations before grand juries . . . ."); *281 Care Committee I*, 638 F.3d at 633 (explaining that, under Mo. Rev. Stat. § 27.030, "the attorney general could only participate in a criminal proceeding if his assistance was requested by the assigned county attorney or the trial court asked him to sign indictments"). Accordingly, the Attorney General's potential enforcement was

37

based on a triple and highly improbable contingency; *i.e.*, a *mentally incompetent* person would be criminally prosecuted for a "*knowing*" attempt to vote when ineligible, local prosecutors would seek the Attorney General's assistance in this prosecution, *and* the Governor would direct the Attorney General to provide such assistance. *See Mo. Protection & Advocacy*, 499 F.3d at 807; Mo. Rev. Stat. §§ 27.030, 56.060(1); Mo. Rev. Stat. § 115.631(2) (providing that it is a crime for a person to "vot[e] at any election *knowing* that the person is not entitled to vote") (emphasis added); *281 Care Committee I*, 638 F.3d at 632-33 (describing *Missouri Protection & Advocacy*'s holding that "the *Ex Parte Young* exception applied" to Missouri's Attorney General because "he could *potentially* have represented the state in a criminal prosecution that *might* have arisen *indirectly* out of an individual's failure to comply with the challenged voter-eligibility law") (emphases added); *see id.* at 625, 626, 632 (holding that, in a pre-enforcement challenge to a statute that proscribed knowingly or recklessly false statements about proposed ballot initiatives, the Minnesota Attorney General had a sufficient "connection" with the statute for three reasons, one of which was that he could become involved in criminal proceedings "upon request of the county attorney assigned to a case").[6]

---

[6] To be sure, in a subsequent appeal in the *281 Care Committee* litigation, this Court held that the Minnesota Attorney General was immune from suit because he

Appellate Case: 14-3084    Page: 49    Date Filed: 10/21/2014 Entry ID: 4208319

Here, the connection between the Arkansas Attorney General and the Act is more direct, and the potential for his involvement in enforcement is far more likely, than in either *Reproductive Health Services* or *Missouri Protection & Advocacy*. In this case, the Attorney General has a *right* to intervene and defend the Act's constitutionality in any civil suit filed under the Act. He does not need to wait for the invitation of a court or another government official to become involved. Moreover, since, as noted, the only issue in any private enforcement effort under the Act will be the Act's constitutionality, it is virtually certain that the Attorney General will be directly involved in such enforcement litigation. At a minimum, the likelihood of such involvement is exponentially greater than the extremely remote possibility that a voter's ineligibility for "mental incapacity" will be adjudicated in a local criminal *prosecution* of the mentally incapable person (rather than the normal administrative procedures for resolving voter eligibility) *and* that the local prosecutors will seek the Attorney General's assistance.

Moreover, in a case involving a constitutional challenge to a Virginia statute,

---

(continued…)

"testified with assurances that [his] office will not take up its discretionary ability to assist in the prosecution" of the challenged law. *281 Care Committee II*, 766 F.3d at 797. By contrast, in the present case, Appellees introduced no such evidence—*i.e.*, testimony from the Arkansas Attorney General that he will not defend the constitutionality of the Act in a suit filed against Appellants—in the District Court.

39

the Fourth Circuit found that Virginia's Attorney General had a sufficient connection to the private suit for standing purposes precisely because "under 28 U.S.C. § 2403(b), the Attorney General, on behalf of the state, could intervene as of right to defend the constitutionality of the statute." *Mobil Oil*, 940 F.2d at 76-77. In that case, Mobil Oil brought a declaratory judgment action to challenge the constitutionality of a law that, according to the Attorney General, was to be enforced through *private* suits. *Id.* at 74, 76. Accepting the Attorney General's representation as true, the Court held that the Attorney General nonetheless had a sufficient connection to the law because, as here, in any private suit to enforce the law, Mobil Oil would assert that the law was unconstitutional and the Attorney General would have a right to intervene. *Id.* at 76. Thus, in a related context, the Fourth Circuit held that the Attorney General's authority to intervene and defend the law created an adequate connection with the challenged statute. *Id.*

In sum, the Arkansas Attorney General's authority to intervene and participate in any case filed against Appellants under the Act establishes the requisite connection between the Attorney General and the Act.

### 2. The Attorney General has an adequate connection with the Act because he has the power to bring a direct action to enforce the Act.

While the Attorney General's authority to involve himself in private enforcement suits through intervention suffices for *Ex Parte Young* purposes, he

40

also has a sufficient connection because of his authority to *directly* sue to challenge Appellants' departures from the Act's requirements. The District Court's analysis was premised on the mistaken belief that when the statute at issue does not explicitly vest the Attorney General with a cause of action, the Attorney General lacks any general power to enforce the statute. As discussed below, however, the Attorney General has the power to directly sue Appellants, pursuant to his authority to enforce the prohibition on unconscionable practices—which include violations of statutes or public policy—or to eliminate public nuisances.

1.     The Attorney General has "some connection" with the Act because he has authority to file a civil-enforcement action against Appellants under the Arkansas Deceptive Trade Practices Act ("DTPA"), on the grounds that the collection and dissemination of ALPR data is an unconscionable practice under the DTPA. The DTPA "prohibits deceptive and unconscionable trade practices, including 'engaging in any other unconscionable, false, or deceptive act or practice in business, commerce or trade.'" *Brown v. Mortgage Elec. Registration Sys., Inc.*, 738 F.3d 926, 935 (8th Cir. 2013). "The Arkansas Supreme Court [has] defined an unconscionable act as 'an act that affronts the sense of justice, decency, or reasonableness' *including acts that violate public policy or a statute*." *Id.* (emphasis added); *see also Curtis Lumber Co. v. La. Pac. Corp.*, 618 F.3d 762 (8th Cir. 2010) (noting that the Arkansas Supreme Court has concluded that the

41

prohibition on unconscionable practices should be "liberally construed" to extend beyond actions that constitute common-law fraud).  Moreover, the Attorney General is expressly authorized to enforce the DTPA, including by seeking an injunction against unlawful practices that are prohibited by the statute.  Ark. Code Ann. § 4-88-104; *see also Mercury Mktg. Techs. of Delaware, Inc. v. State ex rel. Beebe*, 189 S.W.3d 414, 421 (Ark. 2004) (explaining that "a violation of the [DTPA], according to the state Attorney General, is what triggers the prayer for an injunction").

Obviously, the collection and dissemination of ALPR data "violate[s] . . . a statute"—namely, the ALPR statute—and therefore falls within the definition of unconscionable practices.  *See Brown*, 738 F.3d at 935 (defining unconscionable practices to include statutory violations).  Similarly, it "violate[s] public policy," *see id.*, because the Act generally declares it "unlawful" to use an ALPR system, *see* Ark. Code Ann. § 12-12-1803(a).  Thus, the Attorney General has authority to institute an action targeting Appellants' speech on the grounds that it is an "unconscionable" privacy intrusion that violates the Act and the public policy embodied in the Act.  Accordingly, the Attorney General's statutory authority to enforce the prohibition on unconscionable practices provides a sufficient

42

connection for *Ex Parte Young* purposes.[7]

2.     The Attorney General also has a sufficient connection with the Act due to his common-law authority to file civil proceedings that target public nuisances or invasions of rights on highways.

According to the Supreme Court of Arkansas, "it is generally held that the office [of the Attorney General] is clothed, in addition to the duties expressly defined by statute, with all the power pertaining thereto under the common law." *State ex rel. Williams v. Karston*, 187 S.W.2d 327, 329 (Ark. 1945); *see* Ark. Code Ann. §§ 25-16-703(b), 25-16-706(e) (providing that nothing in the cited statutory provisions "shall relieve the Attorney General of discharging any and all duties required of him or her under the common law or by any of the statutes of this state"). And, under the common law, "the Attorney General could 'institute equitable proceedings for the abatement of public nuisances,'" including (1) when the alleged nuisances were "injurious to public health, safety, or morals" or (2) when necessary to "prevent any invasion upon the rights of the public [on] highways." 187 S.W.2d at 329; *see also State of Fla. ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 271 n.19 (5th Cir. 1976) (suggesting that, under Arkansas law, "[t]he

---

[7] In this regard, it is notable that Representative Nate Steel, the sponsor of the Act at issue here, is the Democratic candidate for Attorney General in the election that will be held on November 4, 2014. *See, e.g.*, Arkansas Secretary of State: Candidate Information, *available at* https://www.ark.org/arelections/index.php (last visited Oct. 13, 2014).

43

attorney general, as the chief legal representative of the state, may institute all legal proceedings necessary to protect the interests of the state"). In *Karston*, for example, the Arkansas Supreme Court held that the Attorney General possessed common-law power to seek an injunction against unlawful conduct—there, persistent, unpunished violations of a statute prohibiting gambling, which constituted a nuisance. 187 S.W.2d at 328-30. The court reached this conclusion despite the fact that the Attorney General had no statutory authority to enforce the gambling law at issue. *See id.* at 328, 332; *see also Morley v. Berg*, 226 S.W.2d 559, 560, 566 (Ark. 1950) (concluding that the Attorney General could bring an action to collect royalties owed to the State for certain commercial licenses and could seek injunctive relief against those who acted without such licenses "if authority to do so were granted by statute, or under his common-law powers unless such authority was specifically taken from him by the Legislature").

The Arkansas Supreme Court has further suggested that the Attorney General need not have a "specific statutory mandate" in order to bring civil-enforcement actions "to protect the public interest." *See Mercury Mktg.*, 189 S.W.3d at 419-22. In *Mercury Marketing*, the court held that the "traditional common-law prerequisites for an injunction in civil litigation" do not apply when the Attorney General "has a specific statutory mandate to protect the public interest." *Id.*; *see also S. Coll. of Naturopathy v. State ex rel. Beebe*, 203 S.W.3d

44

111, 117 (Ark. 2005) (reaffirming the principle that "when the Attorney General has a specific statutory mandate to protect the public interest, the traditional common-law prerequisites for an injunction in civil litigation . . . are not applicable," because "[i]t is a violation of the Act that triggers the prayer for an injunction").  The implication of this holding is that, when the Attorney General does *not* have a specific statutory vehicle for pursuing civil injunctive relief, he *would* be subject to the traditional common-law requirements for a preliminary injunction.  *See id.*  Accordingly, *Mercury Marketing* suggests that—even without a specific statutory mandate—the Attorney General may nevertheless pursue a civil action, only under a more burdensome standard for obtaining relief.  *See id.*

Thus, the Attorney General has common-law authority to seek an injunction prohibiting Appellants' use of ALPR systems in violation of the Act, on the ground that their ALPR use is a nuisance that is "injurious" to the public interest and/or an "invasion upon the rights of the public [on] highways."  *See Karston*, 187 S.W.2d at 329.  The prospect of the Attorney General taking such an action is heightened because the Act declares unauthorized ALPR use "unlawful," instead of stating simply that unauthorized ALPR users are subject to potential civil liability.

The Attorney General's common-law authority to institute civil actions gives him a sufficient connection with the Act.  Indeed, in *Ex Parte Young*, the Supreme Court held that the Minnesota Attorney General had a sufficient connection with

45

the challenged law because, "under his power existing *at common law* and by virtue of . . . various statutes," he had a "general duty imposed upon him, which include[d] the right and the power to enforce the statutes of the State."  209 U.S. at 161 (emphasis added).

### 3. The Attorney General has a sufficient connection with the Act because there is a significant possibility that he will be involved in defending lawsuits brought against him or other state actors pursuant to the Act.

While the Attorney General's potential role as an intervening or direct plaintiff satisfies *Ex Parte Young*, he has an even greater connection because there is a substantial probability that he will be involved in defending against lawsuits filed under the Act.

1.     The Arkansas Attorney General has "some connection" with the Act's enforcement because he is charged with defending state agencies, and it is probable that private parties will sue Arkansas law enforcement agencies for using ALPR data in a way that is inconsistent with the statute.  The Act authorizes any "state, county, or municipal law enforcement agency" to use an ALPR system under certain conditions.  Ark. Code Ann. § 12-12-1803(b) (authorizing law enforcement agencies, "parking enforcement entities," and entities that "control[ ] access to secured areas" to use ALPR systems).  If a law enforcement agency were to violate one of the statutory conditions for ALPR use—for example, by retaining ALPR data for a longer period of time than the Act allows—a private party could sue a

46

law enforcement agency or an appropriate official thereof. *See id.* § 12-12-1807

(creating a cause of action for violations of the Act); *id.* § 12-12-1804(a), (b)

(establishing restrictions on how long ALPR data may be retained).

If a law enforcement agency were sued under the Act, the Attorney General

would have a duty to defend that agency in the ensuing litigation. Arkansas law

provides that "[t]he Attorney General shall be the attorney for all state officials,

departments, institutions, and agencies. Whenever any officer or department,

institution, or agency of the state needs the services of an attorney, the matter shall

be certified to the Attorney General for attention." Ark. Code Ann. § 25-16-702(a).

In addition, "[t]he Attorney General . . . shall be the legal representative of all state

officers, boards, and commissions in all litigation where the interests of the state

are involved." *Id.* § 25-16-703(a); *see also id.* § 25-16-704(a) (requiring the

Attorney General to "maintain and defend the interests of the state in all matters"

before the Arkansas Supreme Court); *cf. id.* § 25-16-705(a) (providing the

Attorney General a subpoena power "[i]n all litigation . . . in which the interests of

the State of Arkansas are involved or may become involved").

The Attorney General's role in defending such a suit under the Act

establishes an adequate connection between him and the statute. Indeed, this Court

held in *281 Care Committee I* that the connection between the Minnesota Attorney

General and the challenged statute was sufficient because, among other reasons,

the Attorney General was responsible for defending a state office's decisions under the statute, if they were challenged in court. *281 Care Committee I*, 638 F.3d at 632.

2.     The Attorney General also has a sufficient connection with the Act because it authorizes him to use ALPR systems. Specifically, the Act authorizes a "law enforcement agency" to use ALPR systems for certain purposes. Ark. Code Ann. § 12-12-1803(b)(1). And, as a matter of Arkansas law, "[t]he office of the Attorney General is designated as a law enforcement agency." *Id.* § 25-16-713(a). Thus, the Attorney General's Office directly benefits from one of the Act's express exceptions, and the Office must comply with the Act's restrictions if it collects or disseminates ALPR data. Moreover, if the Attorney General does not comply with such restrictions, he could be sued under the Act. This gives the Attorney General an additional connection with the Act for *Ex Parte Young* purposes.

**C.     The Governor Is Sufficiently Connected to the Act Because He Could Order the Attorney General Not to Defend the Act's Constitutionality and Not to Initiate a Suit Against Appellants Based on the Speech at Issue Here.**

In addition to the fact that the Governor is responsible for the execution and enforcement of the State's laws, *see supra* at § III.A, the Governor has a sufficient connection with the Act because he could order the Attorney General not to defend the constitutionality of the Act. The "supreme executive power" is vested in the Governor, Ark. Const. Art. VI, § 2, and the Attorney General is part of "[t]he

48

executive department of [the] State," Ark. Const. Art. VI, § 1. The Governor also has authority relating to the removal of the Attorney General. *See* Ark. Const. Art. XV, § 3 ("The governor, upon the joint address of two-thirds of all the members elected to each House of the General Assembly, for good cause, may remove the . . . Attorney-General . . . .").

Based on the foregoing authorities, it is evident that the Governor could order the Attorney General not to defend the constitutionality of the Act. Indeed, when Appellants made this argument in the District Court, Appellees failed to cite any authority providing that the Governor does *not* have this power. Moreover, if the Governor were to order the Attorney General not to defend the Act's constitutionality, it would not be the first time the Governor has directed the Attorney General's handling of constitutional litigation in Arkansas. In *Lake View Sch. Dist. No. 25*, for example, a representative "of the Attorney General's office stated that the Governor directed the Attorney General to 'pursue . . . the settlement'" in that constitutional litigation. 340 Ark. at 490. In the present case, the Governor could order the Attorney General not to defend the Act's constitutionality in a case filed against Appellants under the Act. Likewise, the Governor could order the Attorney General not to initiate a lawsuit against Appellants based on the speech at issue here.

49

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court reverse the District Court's order granting the motion to dismiss, vacate the judgment, and vacate the denial of Appellants' preliminary injunction motion.

Dated: October 21, 2014

Respectfully submitted,

s/  Michael A. Carvin
Michael A. Carvin
Ryan J. Watson
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700
macarvin@jonesday.com
rwatson@jonesday.com

Jane W. Duke
MITCHELL, WILLIAMS, SELIG,
    GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas  72201
Telephone:  (501) 688-8842
Facsimile:  (501) 918-7842
jduke@mwlaw.com

*Counsel for Plaintiffs-Appellants*

50

## CERTIFICATE OF COMPLIANCE

I hereby certify that, in accordance with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) and the general requirements set forth in Federal Rule of Appellate Procedure 32(a)(7)(C) and Eighth Circuit Rule 28A(c), this brief is proportionately spaced, has a typeface of 14-point Times New Roman, contains 12,113 words, and was prepared using Microsoft Office Word 2007. I further certify that the brief and addendum have been scanned for computer viruses, and that they are virus-free.

Dated: October 21, 2014

Respectfully submitted,

s/ Michael A. Carvin
Michael A. Carvin
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
macarvin@jonesday.com

*Counsel for Plaintiffs-Appellants*

Appellate Case: 14-3084   Page: 62   Date Filed: 10/21/2014 Entry ID: 4208319

# ADDENDUM OF STATUTES AND REGULATIONS

## TABLE OF CONTENTS

**Page**

28 U.S.C. § 2403(b) ...................................................................A1

Federal Rule of Civil Procedure 5.1 ..........................................A2

Ark. Const. Art. VI, §§ 1, 2, 7 ...................................................A3

Ark. Const. Art. XV, § 3 ............................................................A4

Ark. Code Ann. § 4-88-104 ........................................................A5

Automatic License Plate Reader System Act, 2013 Ark. Acts 1491 (codified
    at Ark. Code Ann. § 12-12-1801 *et seq.*) ...................................A6

Ark. Code Ann. § 16-111-106(b).................................................A11

Ark. Code Ann. § 25-16-702(a), (b) ...........................................A12

Ark. Code Ann. § 25-16-703 .......................................................A13

Ark. Code Ann. § 25-16-704(a) ...................................................A14

Ark. Code Ann. § 25-16-705(a) ...................................................A15

Ark. Code Ann. § 25-16-706(a), (e) ............................................A16

Ark. Code Ann. § 25-16-713(a) ...................................................A17

Mo. Rev. Stat. § 27.030 .............................................................A18

Mo. Rev. Stat. § 56.060(1)..........................................................A19

Mo. Rev. Stat. § 115.631(2).........................................................A20

Neb. Const. Art. IV, § 6 .............................................................A21

Neb. Rev. Stat. § 42-104 ............................................................A22

Neb. Rev. Stat. § 42-106 ............................................................A23

Neb. Rev. Stat. § 84-731 ............................................................A24

**28 U.S.C. § 2403(b). Intervention by United States or a State; constitutional question**

**(b)** In any action, suit, or proceeding in a court of the United States to which a State or any agency, officer, or employee thereof is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. The State shall, subject to the applicable provisions of law, have all the rights of a party and be subject to all liabilities of a party as to court costs to the extent necessary for a proper presentation of the facts and law relating to the question of constitutionality.

Appellate Case: 14-3084    Page: 64    Date Filed: 10/21/2014 Entry ID: 4208319

**Fed. R. Civ. P. 5.1(a)(1), (a)(2), (b). Constitutional Challenge to a Statute--Notice, Certification, and Intervention**

**(a)** Notice by a Party. A party that files a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute must promptly:

    **(1)** file a notice of constitutional question stating the question and identifying the paper that raises it, if:

        **(A)** a federal statute is questioned and the parties do not include the United States, one of its agencies, or one of its officers or employees in an official capacity; or

        **(B)** a state statute is questioned and the parties do not include the state, one of its agencies, or one of its officers or employees in an official capacity; and

    **(2)** serve the notice and paper on the Attorney General of the United States if a federal statute is questioned--or on the state attorney general if a state statute is questioned--either by certified or registered mail or by sending it to an electronic address designated by the attorney general for this purpose.

**(b)** Certification by the Court. The court must, under 28 U.S.C. § 2403, certify to the appropriate attorney general that a statute has been questioned.

Appellate Case: 14-3084     Page: 65     Date Filed: 10/21/2014 Entry ID: 4208319

**Ark. Const. Art. VI, § 1. Executive officers.**

The executive department of this State shall consist of a Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State and Attorney General, all of whom shall keep their offices in person at the seat of government and hold their offices for the term of two years and until their successors are elected and qualified, and the General Assembly may provide by law for the establishment of the office of Commissioner of State Lands. [As amended by Const. Amend. 6, § 1.]

**Ark. Const. Art. VI, § 2. Governor -- Supreme executive power.**

The supreme executive power of this State shall be vested in a chief magistrate, who shall be styled "the Governor of the State of Arkansas."

**Ark. Const. Art. VI, § 7. Information and reports from departments.**

He may require information, in writing, from the officers of the executive department, on any subject relating to the duties of their respective offices; and shall see that the laws are faithfully executed.

A3

**Ark. Const. Art. XV, § 3. Officers removable by Governor upon address.**

The governor, upon the joint address of two-thirds of all the members elected to each House of the General Assembly, for good cause, may remove the Auditor, Treasurer, Secretary of State, Attorney-General, Judges of the Supreme and Circuit Courts, Chancellors and Prosecuting Attorneys.

A4

**Ark. Code Ann. § 4-88-104. Injunctions.**

In addition to the criminal penalty imposed hereunder, the Attorney General of this state shall have authority, acting through the Consumer Counsel, to file an action in the court designated in § 4-88-112 for civil enforcement of the provisions of this chapter, including, but not limited to, the seeking of restitution and the seeking of an injunction prohibiting any person from engaging in any deceptive or unlawful practice prohibited by this chapter.

A5

**Automatic License Plate Reader System Act, 2013 Ark. Acts 1491 (codified at Ark. Code Ann. § 12-12-1801 *et seq.*).**

**12-12-1801.**

Title.

This subchapter is known and may be cited as the "Automatic License Plate Reader System Act".

**12-12-1802.**

Definitions.

As used in this subchapter:

**(1)** "Alert" means data held by the Office of Motor Vehicle, the Arkansas Crime Information Center including without limitation the Arkansas Crime Information Center's Missing Persons database, the National Crime Information Center, and the Federal Bureau of Investigation Kidnappings and Missing Persons database;

**(2)** "Automatic license plate reader system" means a system of one (1) or more mobile or fixed automated high-speed cameras used in combination with computer algorithms to convert images of license plates into computer-readable data;

**(3)**

　　**(A)** "Captured plate data" means the global positioning device coordinates, date and time, photograph, license plate number, and any other data captured by or derived from any automatic license plate reader system;

　　**(B)** Captured plate data shall not include any personal data;

**(4)** "Governmental entity" means a lawfully created branch, department, or agency of the federal, state, or local government; and

**(5)** "Secured area" means an area, enclosed by clear boundaries, to which access is limited and not open to the public, and entry is obtainable only through specific access-control points.

A6

**12-12-1803.**

Restrictions on use.

**(a)** Except as provided in subsection (b) of this section, it is unlawful for an individual, partnership, corporation, association, or the State of Arkansas, its agencies, and political subdivisions to use an automatic license plate reader system.

**(b)** An automatic license plate reader system may be used:

**(1)** By a state, county, or municipal law enforcement agency for the comparison of captured plate data with data held by the Office of Motor Vehicle, the Arkansas Crime Information Center, the National Crime Information Center, a database created by law enforcement for the purposes of an ongoing investigation, and the Federal Bureau of Investigation for any lawful purpose;

**(2)** By parking enforcement entities for regulating the use of parking facilities; or

**(3)** For the purpose of controlling access to secured areas.

**12-12-1804.**

Protections.

**(a)** Captured plate data obtained for the purposes described under Section 12-12-1803(b) shall not be used or shared for any other purpose and shall not be preserved for more than one hundred fifty (150) days.

**(b)** Captured plate data obtained by an entity under Section 12-12-1803(b)(1) may be retained as part of an ongoing investigation and shall be destroyed at the conclusion of either:

**(1)** An investigation that does not result in any criminal charges being filed; or

**(2)** Any criminal action undertaken in the matter involving the captured plate data.

A7

**(c)** A governmental entity that uses an automatic license plate reader system under Section 12-12-1803(b)(1) shall update the captured plate data collected under this subchapter every twenty-four (24) hours if updates are available.

**(d)**

> **(1)** Except as provided under subdivision (d)(2) of this section, a governmental entity authorized to use an automatic license plate reader system under Section 12-12-1803(b) shall not sell, trade, or exchange captured plate data for any purpose.

> **(2)** Captured plate data obtained by a law enforcement agency under Section 12-12-1803(b)(1) that indicates evidence of an offense may be shared with other law enforcement agencies.

**12-12-1805.**

Practice and usage data preservation.

**(a)** An entity that uses an automatic license plate reader system under Section 12-12-1803(b) shall:

> **(1)** Compile statistical data identified in subsection (b) of this section every six (6) months into a format sufficient to allow the general public to review the compiled data; and

> **(2)** Preserve the compiled data for eighteen months.

**(b)** The preserved data shall include:

> **(1)** The number of license plates scanned;

> **(2)**

> > **(A)** The names of the lists against which captured plate data were checked;

> **(3)** For each check of captured plate data against a list:

> > **(A)** The number of confirmed matches;

> > **(B)** The number of matches that upon further investigation did not correlate to an alert; and

Appellate Case: 14-3084     Page: 71     Date Filed: 10/21/2014 Entry ID: 4208319

**(C)** The number of matches that resulted in arrest and prosecution; and

**(4)**

**(A)** Promulgate rules and policies concerning the manner and method of obtaining, retaining, and destroying captured plate data, including, without limitation, specific rules and policies concerning retention of material in excess of one hundred fifty (150) days under Section 12-12-1804(b), and make those rules and policies available for public inspection.

**(B)** Failure to comply with subdivision (b)(4)(A) of this section shall be grounds for a court of competent jurisdiction to exclude any evidence obtained under this subchapter.

## 12-12-1806.

Use of data and data-derived evidence.

Captured plate data and evidence derived from it shall not be received in evidence in any trial, hearing, or other proceeding before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the state or a political subdivision of the state if the disclosure of that information would be in violation of this subchapter.

## 12-12-1807.

Penalties.

**(a)** A person who violates this subchapter shall be subject to legal action for damages to be brought by any other person claiming that a violation of this subchapter has injured his or her business, person, or reputation.

**(b)** A person so injured shall be entitled to actual damages, or liquidated damages of one thousand dollars ($ 1,000), whichever is greater and other costs of litigation.

Appellate Case: 14-3084    Page: 72    Date Filed: 10/21/2014 Entry ID: 4208319

**12-12-1808.**

Privacy.

    **(a)**

        **(1)** Captured plate data or data obtained from the Office of Motor Vehicle may be disclosed only:

            **(A)** To the person to whom the vehicle is registered;

            **(B)** After the written consent of the person to whom the vehicle is registered; or

            **(C)** If the disclosure of the data is permitted by the Driver Privacy Protection Act of 1994, 18 U.S.C. Section 2721 et seq., as it existed on January 1, 2013.

        **(2)** Practice and usage data compiled and preserved under Section 12-12-1806 are a public record for purposes of the Freedom of Information Act of 1967, Section 25-19-101 et seq.

    **(b)** Upon the presentation to an appropriate governmental entity of a valid, outstanding protection order protecting the driver of a vehicle jointly registered with or registered solely in the name of the individual against whom the order was issued, captured plate data shall not be disclosed except as the result of a match under Section 12-12-1803(b).

Appellate Case: 14-3084    Page: 73    Date Filed: 10/21/2014 Entry ID: 4208319

**Ark. Code Ann. § 16-111-106(b). Parties.**

 **(b)**  In any proceeding which involves the validity of a municipal ordinance or franchise, the municipality shall be made a party and shall be entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the Attorney General of the state shall also be served with a copy of the proceeding and be entitled to be heard.

Appellate Case: 14-3084     Page: 74     Date Filed: 10/21/2014 Entry ID: 4208319

**Ark. Code Ann. § 25-16-702(a), (b). Representation of state agencies and officers generally -- Employment of outside counsel.**

**(a)**  The Attorney General shall be the attorney for all state officials, departments, institutions, and agencies. Whenever any officer or department, institution, or agency of the state needs the services of an attorney, the matter shall be certified to the Attorney General for attention.

**(b)**

    **(1)**  All office work and advice for state officials, departments, institutions, and agencies shall be given by the Attorney General and his or her assistants, and no special counsel shall be employed or additional expense paid for those services.

    **(2)**  If, in the opinion of the Attorney General, it shall at any time be necessary to employ special counsel to prosecute any suit brought on behalf of the state or to defend a suit brought against any official, board, commission, or agency of the state, the Attorney General, with the approval of the Governor, may employ special counsel. The compensation for the special counsel shall be fixed by the court where the litigation is pending, with the written approval of the Governor and the Attorney General. The Attorney General shall not enter into any contract for the employment of outside legal counsel without first seeking prior review by the Legislative Council.

A12

**Ark. Code Ann. § 25-16-703**. **Representation of state interests in federal courts.**

**(a)**  The Attorney General shall maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts and shall be the legal representative of all state officers, boards, and commissions in all litigation where the interests of the state are involved.

**(b)**  Nothing in this section shall relieve the Attorney General of discharging any and all duties required of him or her under the common law or by any of the statutes of this state, nor shall it relieve the prosecuting attorneys of any duties required of them by the statutes of this state.

A13

**Ark. Code Ann. § 25-16-704(a). Representation of state interests in Supreme Court -- Writs of quo warranto.**

**(a)** The Attorney General shall attend the several sittings of the Supreme Court and shall maintain and defend the interests of the state in all matters before that tribunal.

A14

**Ark. Code Ann. § 25-16-705(a) - Subpoena power -- Attendance of witnesses.**

**(a)** In all litigation, including criminal matters, in which the interests of the State of Arkansas are involved or may become involved before any tribunal, board, or commission, the Attorney General shall have the right to subpoena any person or the books, records, or other documents being held by any person. He or she shall have the authority to administer oaths for the purpose of taking testimony of witnesses subpoenaed before him or her, which he or she may deem necessary to adequately present the state's case.

A15

**Ark. Code Ann. § 25-16-706(a), (e). Opinions.**

**(a)**

    **(1)** Upon request, the Attorney General without fee or reward shall give his or her opinion to the Governor and to the heads of the executive departments of this state upon any constitutional or other legal question that may concern the official action of those officers.

    **(2)** When requested, he or she shall give his or her opinion to the prosecuting attorney of any district upon any legal question that concerns the financial interests of the state or any county and upon any question connected with the administration of the criminal laws of the state.

    **(3)** When requested, he or she shall also give his or her opinion to either house of the General Assembly and any member thereof upon the constitutionality of any proposed bill and to all state boards and commissions upon any question connected with the discharge of the duties of those boards and commissions.

**(e)** Nothing in subsections (a)-(d) of this section shall relieve the Attorney General of discharging any and all duties required of him or her under the common law or by any of the statutes of this state or relieve the prosecuting attorneys of any duties required of them by the statutes of this state.

Appellate Case: 14-3084    Page: 79    Date Filed: 10/21/2014 Entry ID: 4208319

**Ark. Code Ann. § 25-16-713(a). Attorney General -- Designated law enforcement agency.**

**(a)**  The office of the Attorney General is designated as a law enforcement agency.

Appellate Case: 14-3084    Page: 80    Date Filed: 10/21/2014 Entry ID: 4208319

**Mo. Rev. Stat. § 27.030. To aid prosecuting and circuit attorneys, when.**

When directed by the governor, the attorney general, or one of his assistants, shall aid any prosecuting or circuit attorney in the discharge of their respective duties in the trial courts and in examinations before grand juries, and when so directed by the trial court, he may sign indictments in lieu of the prosecuting attorney.

A18

**Mo. Rev. Stat. § 56.060(1). Prosecutor's duties, generally, expenses--employed attorney, how compensated.**

**(1)** Each prosecuting attorney shall commence and prosecute all civil and criminal actions in the prosecuting attorney's county in which the county or state is concerned, defend all suits against the state or county, and prosecute forfeited recognizances and actions for the recovery of debts, fines, penalties and forfeitures accruing to the state or county. In all cases, civil and criminal, in which changes of venue are granted, the prosecuting attorney shall follow and prosecute or defend, as the case may be, all the causes, for which, in addition to the fees now allowed by law, the prosecuting attorney shall receive his or her actual expenses. If any misdemeanor case is taken to the court of appeals by appeal the prosecuting attorney shall represent the state in the case in the court and make out and cause to be printed, at the expense of the county, all necessary abstracts of record and briefs, and if necessary appear in the court in person, or shall employ some attorney at the prosecuting attorney's own expense to represent the state in the court, and for his or her services he or she shall receive the compensation that is proper, not to exceed twenty-five dollars for each case, and necessary traveling expenses, to be audited and paid as other claims are audited and paid by the county commission of the county.

A19

**Mo. Rev. Stat. § 115.631(2). Class one election offenses.**

The following offenses, and any others specifically so described by law, shall be class one election offenses and are deemed felonies connected with the exercise of the right of suffrage. Conviction for any of these offenses shall be punished by imprisonment of not more than five years or by fine of not less than two thousand five hundred dollars but not more than ten thousand dollars or by both such imprisonment and fine:

* * *

**(2)** Voting more than once or voting at any election knowing that the person is not entitled to vote or that the person has already voted on the same day at another location inside or outside the state of Missouri;

**Neb. Const. Art. IV, § 6. Supreme executive power**

The supreme executive power shall be vested in the Governor, who shall take care that the laws be faithfully executed and the affairs of the state efficiently and economically administered.

**Neb. Rev. Stat. § 42-104. Solemnization; license; application; requirements**

Prior to the solemnization of any marriage in this state, a license for that purpose shall be obtained from a county clerk in the State of Nebraska. Applications for a marriage license made with the county court prior to January 1, 1987, shall be processed and licenses shall be issued by the county court according to the law and procedures in effect on the date each application was made. No marriage hereafter contracted shall be recognized as valid unless such license has been previously obtained and used within one year from the date of issuance and unless such marriage is solemnized by a person authorized by law to solemnize marriages. Each party shall present satisfactory documentary proof of and shall swear or affirm to the application giving: (1) Full name of each applicant and residence; and (2) the place, date, and year of birth of each.

Appellate Case: 14-3084    Page: 85    Date Filed: 10/21/2014 Entry ID: 4208319

**Neb. Rev. Stat. § 42-106. License issued by county clerk; contents; marriage record; forms.**

When an application is made for a license to the county clerk, he or she shall, upon the granting of such license, state in the license the information contained in the application as provided in section 42-104. The license shall, prior to the issuing thereof, be entered of record in the office of the county clerk in a suitable book to be provided for that purpose.

The forms for the application, license, and certificate of marriage shall be provided by the Department of Health and Human Services at actual cost as determined by the department.

Appellate Case: 14-3084    Page: 86    Date Filed: 10/21/2014 Entry ID: 4208319

**Neb. Rev. Stat. § 84-731. Governor; duty to implement laws; exceptions; Attorney General; action to implement**

Pursuant to his constitutional duty to take care that the laws be faithfully executed, whenever it shall come to the attention of the Governor that any agency charged with the implementation of any act of the Legislature is failing to implement such act, he shall immediately in writing order the agency to commence implementation unless (1) the act shall have been held unconstitutional by final judgment of the Supreme Court, (2) the agency shall have been enjoined from implementation by court order, or (3) an action challenging the constitutionality of the act is pending in a court of competent jurisdiction. He shall furnish a copy of such letter to the Attorney General together with a written order to commence or cause to be commenced an action in a court of competent jurisdiction to compel implementation if the agency has not, within ten working days, commenced implementation. It shall be the duty of the Attorney General to comply with such order.

A24

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of October, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic notification of such filing to all CM/ECF participants, including the following:

Patrick E. Hollingsworth
Assistant Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201-2610
Telephone: (501) 682-1051
Patrick.Hollingsworth@arkansasag.gov

*Counsel for Defendants-Appellees*

s/  Michael A. Carvin
Michael A. Carvin
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:   (202) 626-1700
macarvin@jonesday.com

*Counsel for Plaintiffs-Appellants*

A25